## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JULIAN JAMES, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3576 |
| | § | |
| HARRIS COUNTY, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court in this civil rights action are cross-Motions for Judgment as a Matter of Law filed by Defendant Harris County (the "County's Motion") [Doc. # 485][1] and Plaintiffs ("Plaintiffs' Motion") [Doc. # 508],[2] as well as a separate Motion for Judgment as a Matter of Law filed by Plaintiff Julian James (the "James Motion") [Doc. # 524].[3] The County seeks judgment as a matter of law on all Plaintiffs' claims. Upon a careful review of the evidence admitted at trial, all

---

[1]  The Court considers the County's Motion to include its supplement [Doc. # 507]. Briefing on the Motion includes a response filed by all Plaintiffs ("Plaintiffs' Response") [Doc. # 510] and the County's reply [Doc. # 522].

[2]  Plaintiffs' legal arguments on their Motion are presented in their Memorandum of Law and Argument in Support of Plaintiffs' Response to Defendant Harris County's Motion for Judgment as a Matter of Law and Plaintiffs' Rule 50 Motion for Judgment as a Matter of Law ("Plaintiffs' Mem.") [Doc. # 519]. Briefing on Plaintiffs' Joint Motion includes Defendant's Objections [Doc. # 521], a "Sur-Reply to Defendants' Objections, Reply and Responses Filed in Opposition to Plaintiffs' Motion for Judgment and 'Renewed' Motion for Judgment," filed by all Plaintiffs [Doc. # 523], and a surreply to that document by Defendants [Doc. # 528].

[3]  Defendant responded [Doc. # 526] to the James Motion, and James replied [Doc. # 527]. The surreply [Doc. # 528] to Plaintiffs' Motion is also a surreply to the James Motion.

applicable law, and the parties' briefing on each motion, the Court concludes that Defendant Harris County's Motion for Judgment as a Matter of Law should be **granted**.  Plaintiffs' Motion and the James Motion are **denied**.

## I.   FACTUAL AND LEGAL BACKGROUND

The Court briefly summarizes the facts of this case, which are set out in full detail in the trial record.  On May 16, 2004, at approximately 1:20 a.m., Harris County Deputy Sheriff William Wilkinson ("Wilkinson") stopped a vehicle driven by Hiji Harrison ("Harrison").  The sequence of events that followed is hotly contested, but the parties agree that it ended with Wilkinson shooting and killing Harrison.  The Internal Affairs Department ("IAD") of the Harris County Sheriff's Office ("HCSO")[4] determined that Wilkinson did not breach any departmental policy, practice, or procedure.

Plaintiffs are Harrison's mother, wife, and minor child.  They have sued Defendant Harris County[5] pursuant to 42 U.S.C. §§ 1983, 1988, alleging violations of Harrison's rights under the Fourth, Eighth, and Fourteenth Amendments to the United

---

[4]    The parties consistently refer to the Sheriff's Office as the "Harris County Sheriff's Department."  However, the Court adopts the moniker of the official Sheriff's Office website.

[5]    Plaintiffs originally sued the Harris County Sheriff's Department and Wilkinson.  *See* Plaintiffs' Original Complaint, at 1.  The Court granted Wilkinson's Motion for Summary Judgment after the Plaintiffs' Third Amended Complaint made it plain that he had been sued only in his official capacity, making his presence superfluous to that of the HCSO.  *See* Memorandum and Order of June 16, 2006 [Doc. # 241], at 1-2.

States Constitution.  After a 10-day trial, the jury deliberated for six days before

informing the Court that it had reached "an unresolvable impasse" and was unable to

reach a verdict.[6]

## II.   JUDGMENT AS A MATTER OF LAW – LEGAL STANDARDS

The Federal Rules of Civil Procedure provide for judgment as a matter of law

where a party, having been fully heard on an issue by a jury, has not established a

"legally sufficient evidentiary basis" for its claim or defense, such that no "reasonable

jury" could find for that party on that issue.  FED. R. CIV. P. 50(a)(1).  A motion for

judgment as a matter of law under Rule 50(a) "must specify the judgment sought and

the law and facts that entitle the movant to the judgment," and must be made *before* the

case is actually submitted to the jury.  FED. R. CIV. P. 50(a)(2).

If the court does not grant a party's Rule 50(a) motion during trial, the matter is

deemed submitted to the jury "subject to the court's later deciding the legal questions

raised by the motion."  FED. R. CIV. P. 50(b).  When no verdict is reached by the jury,

a movant who properly made the motion during trial may renew its motion post-trial

under Rule 50(b), but must do so no later than ten days after the jury is discharged.[7]

---

[6]     *See* Jury Note 10 [Doc. # 488-3]; Minute Entry Order of February 13, 2007 [Doc. # 488].
The jury could not agree on the first and predicate issue — whether Wilkinson had used
excessive force — and did not reach the other issues.

[7]     When there is a verdict, the movant must renew the motion within ten days of the entry of
(continued...)

*Id.*  A proper Rule 50(a) motion, made before the case is submitted to the jury, is a prerequisite to a post-trial Rule 50(b) motion.  *See United States for use of Wallace v. Flintco Inc.*, 143 F.3d 955, 963 (5th Cir. 1998) (motion under Rule 50(a) is required "to alert [nonmovant] to the specific grounds for an anticipated challenge to the sufficiency of its proof and to allow [nonmovant] the opportunity to move to cure any such deficiency").  The Rule 50(a) motion controls the breadth of a subsequent Rule 50(b) motion, as well.  A matter not broached by the Rule 50(a) motion may not be subsequently raised under Rule 50(b).  *See Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 247 (5th Cir. 2005); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 284 n.5 (5th Cir. 1999).  If there was no verdict at trial, as is the case here, a court granting a Rule 50(b) motion may grant a new trial, or "direct entry of judgment as a matter of law" if no reasonable jury could have found in favor of the nonmovant on the basis of the evidence at trial.  FED. R. CIV. P. 50(b)(2)(B).

## III.  <u>SECTION 1983 CLAIMS AND ELEMENTS IN ISSUE</u>

As a local government unit, Harris County is subject to liability under § 1983 if it committed a constitutional tort through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *City of St. Louis*

---

[7]     (...continued)
     judgment.  *See id.*

*v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell v. Dept. of Social Svcs. of City of New York*, 436 U.S. 658, 690 (1978)).  Liability may be imposed on a county "only for acts for which the [county] itself is actually responsible, 'that is, acts which the [county] has officially sanctioned or ordered.'" *Praprotnik*, 485 U.S. at 123 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)).  Because the case proceeded to trial against the County, and not Wilkinson in an individual capacity, the Court must be careful not to collapse municipal liability into *respondeat superior* liability by failing to adhere to the rigorous requirements of municipal "culpability and causation."  *See Snyder v. Trapagnier*, 142 F.3d 791, 796 (5th Cir. 1998); *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 415 (1997).

To meet the requirements for a § 1983 claim at trial, Plaintiffs were required to prove (1) an official policy or custom, of which (2) a final policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation[8] whose "moving force" is that policy or custom.  *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001);

---

[8]     The fact that Harrison was killed, while tragic, is not in and of itself a violation of Harrison's rights.  Plaintiffs were required to prove that the shooting was a constitutional injury, namely, that it was an unjustified act of objectively unreasonable force, excessive to Wilkinson's need to protect himself, and was the direct and sole cause of some injury.  *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).

*James v. Harris County*, No. 04-3576, 2006 WL 2827050, *7 (S.D. Tex. Sept. 28, 2006).

There must be a formal or informal policy of the municipality. *See Snyder*, 142 F.3d at 798 (citing *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1989)). An official policy may be proven with "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841. Where there is no official adoption or authorization, a municipal policy may be shown by a custom that is "a persistent, widespread practice of City officials or employees . . . so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster*, 735 F.2d at 841; *Piotrowski*, 237 F.3d at 579. Accordingly, an apparently unofficial policy may be evidence of an unwritten or unarticulated official policy. Plaintiffs may not show a policy through mere proof of isolated or random incidents. *See Piotrowski*, 237 F.3d at 578 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984)).

Proof of the existence of a policy or custom is insufficient to sustain § 1983 liability without actual or constructive knowledge of that policy on the part of a policymaker. Showing constructive knowledge of a municipal custom requires

"evidence that the incidents were the 'subject of prolonged public discussion or of a high degree of publicity.'"   *Pineda*, 291 F.3d at 328 (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

In addition to proof of an official custom or policy that is known to the policymaker, Plaintiffs also needed to prove that the HCSO's alleged custom or policy was the "moving force" behind the constitutional injury.   To show moving force, Plaintiffs were required to "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404; *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) ("a direct causal connection must exist between the policy and the alleged constitutional deprivation").   "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).   Moving force is not "a mere but for coupling between cause and effect." *Fraire*, 957 F.2d at 1281 (citing *City of Canton*, 489 U.S. at 388-89).   Merely showing that correcting the allegedly deficient policy would have *prevented* the claimed constitutional injury is therefore not sufficient to meet Plaintiffs' burden. *See Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 386 (5th Cir. 2005).   The "municipal policy must be *affirmatively* linked to the constitutional violation." *Fraire*, 957 F.2d at 1281 (emphasis added) (citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).

Even if a municipal policy is the moving force behind a constitutional injury resulting from excessive force, Plaintiffs cannot recover from the County under § 1983 without proof "either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers 'with 'deliberate indifference' as to its known or obvious consequences.'" *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (citing *Brown*, 520 U.S. at 397); *see Piotrowski,* 237 F.3d at 579 ("even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result").  Proof of "[d]eliberate indifference . . . is a stringent test," *Piotrowski*, 237 F.3d at 579, and a municipality is not deliberately indifferent to the consequences of its policies merely through negligence, even if that negligence is gross.  *See City of Canton*, 489 U.S. at 388-89; *Piotrowski*, 237 F.3d at 579.  To support liability under § 1983, the policy must be *deliberate*, and that is the case "'where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *Id*. at 389 (citing *Pembaur*, 475 U.S. at 483-84).  In order to show deliberate indifference, Plaintiffs were required to show, for instance, "more than a single instance of the lack of training or supervision causing a violation of constitutional

rights." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001). "The plaintiff must generally demonstrate at least a pattern of similar violations."[9] *Id.*

To prevail, in summary, Plaintiffs were required to present evidence sufficient to allow a reasonable jury to find that there was a municipal policy, of which a policymaker was actually or constructively aware, that was the moving force behind Harrison's constitutional injury. Plaintiffs were additionally required to prove that the County — through the HCSO — deliberately adopted that policy and was indifferent to its "known or obvious consequences" to the constitutional violations likely to result from the policy. *Johnson*, 379 F.3d at 309.

## IV.   ANALYSIS

***Overview.***— At trial, the parties aggressively contested the issue of whether Wilkinson used excessive force. The jury could not reach a unanimous verdict on this question. The Court concludes that a reasonable jury could have found in Plaintiffs' favor on this element, based on the evidence produced at trial. Plaintiffs acknowledged

---

[9]     There is an exception that allows a plaintiff to show indifference by "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for [a prophylactic policy]." *McClendon v. City of Columbia*, 258 F.3d 432, 442 (5th Cir. 2001); *see Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003). The single-incident exception is "narrow," however, and it is a doctrine that the court of appeals has "been reluctant to expand." *Burge*, 336 F.3d at 373 (citing *Pineda*, 291 F.3d at 334-35). The exception applies "only where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train." *Id.* (citing *Brown v. Bryan County, OK*, 219 F.3d 450, 461 (5th Cir. 2000)).

at trial and do not now deny that the HCSO had a policy prohibiting use of excessive force.[10]   Rather, Plaintiffs contend that the HCSO had a custom and practice of permitting deputies' use of excessive force against the public by (i) inadequately investigating officer-involved shootings (the "under-investigation theory"); (ii) relying for serious administrative sanctions of deputies on the outcome of the HCSO's referral of the incidents to the Harris County District Attorney's Office for presentation to a grand jury (the "delegation theory")[11]; and (iii) inadequately supervising Wilkinson (the "failure to supervise theory").[12]   Plaintiffs thus combine an excessive force claim with one or more alleged HCSO practices or customs.   Plaintiffs also assert a ratification theory, which if proven, would allow Plaintiffs to establish municipal liability in the absence of a preexisting policy or custom where the municipality gave knowing *post hoc* approval of the conduct leading to the alleged harm.

---

[10]   The County excerpted its official policy on the use of force in an affidavit: "**Conduct in Making Arrests or Towards a Prisoner:**  Each Deputy must be firm, resolute and zealous in effecting arrests.  When it becomes necessary to use force in making an arrest or restraining a prisoner, the Deputy shall use only that degree of force necessary under the circumstances."  Affidavit of Major T. G. Enloe, Exhibit A to Motion for Summary Judgment [Doc. # 263], at 4 (boldface original) (citing Department Manual, Chapter II, Section 1.3(B) ("General Rules of Conduct")).  The Department Manual itself is not in the record.

[11]   "[D]efendant's use of a criminal law review process . . . erects an unconstitutional review process that permits the use of deadly force as long as such force cannot be shown to be criminal or excessive under criminal law standards." Plaintiffs' Mem., at 4.

[12]   The County's evidence established that the HCSO had an internal procedure for evaluating whether officers violated technical, ministerial or objectively verifiable regulations such as failing to wear a badge or uniform, or failing to keep a weapons license current.  These types of violations are not at issue.

For their formal and informal policy theories, Plaintiffs were required to present at trial not only evidence that the alleged policy existed, but that it was the moving force behind the specific constitutional harm alleged in this case, and proof that the policy was adopted with deliberate indifference to the potential constitutional harms it would cause.  Plaintiffs did not present sufficient evidence to allow a reasonable jury to find in their favor on all the § 1983 elements under any theory of municipal liability.  Even where the Court presumes *arguendo* that Wilkinson's use of deadly force was excessive to the need he faced, Plaintiffs failed on each theory to meet the "moving force" and "deliberate indifference" tests.  Plaintiffs also did not adduce evidence sufficient to support a reasonable jury's verdict on the failure to supervise or the ratification theories.

### A.   Policy, Custom, or Practice Theories

***Use of Excessive Force***.— At its core, and put in the light most favorable to Plaintiffs, Plaintiffs' primary custom and practice theory is that the HCSO customarily permitted officers' widespread use of excessive force by adopting the practice of failing to sanction deputies who use excessive force in officer-involved shootings.  Plaintiffs

contend that this custom of implicitly permitting the use of excessive force caused Wilkinson to do so against Harrison.[13]

To the extent that Plaintiffs claim the HCSO's objectionable custom is permitting unjustified officer-involved shootings *per se* — as opposed to the theory that the practice of use of excessive force was attributable to an extrinsic related custom, such as allegedly inadequate investigations — the claim fails as a matter of law on the trial record presented by Plaintiffs.[14]  Plaintiffs did not present evidence that the HCSO's officer-involved shootings prior to Harrison's were in fact unjustified or excessive to the needs faced by the deputies involved.   Without such evidence, there is no evidentiary basis for finding that the HCSO had a custom or practice of such shootings. Plaintiffs' two expert witnesses, respectively, gave opinions on 36 and 38 officer-involved shootings within the HCSO over a two-and-a-half year period.[15]  Each expert

---

[13]     To some extent, Plaintiffs' theory implies the County was negligent or grossly negligent. There is no actionable § 1983 claim under such a theory. *See Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995); *Fraire*, 957 F.2d at 1276; *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989); *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988).

[14]     It is unclear if Plaintiffs also contend the custom was use of excessive force generally. Because Plaintiffs' experts refer only to officer-involved shootings, the Court focuses its analysis on those types of incidents.

[15]     David Klinger, one of Plaintiffs' expert witnesses, testified that he "reviewed 36 Internal Affairs investigative case files from Harris County regarding officer involved or deputy involved shootings that occurred between the year 2002 and the year 2004, stopping with the Hiji Harrison shooting."   Transcript of Testimony of David Klinger, January 26, 2007 ("Klinger Tr.") [Doc. # 500], at 10, 72.  These reports were drawn from "the whole universe (continued...)

lodged criticisms about less than two-thirds of the investigations, but opined generally

that the incidents may have involved the use of excessive force.[16]  Plaintiffs presented

no evidence that any of those incidents in fact involved an unjustified use of force.

Rather, Plaintiffs rested on their experts' opinions that the HCSO inadequately

investigated the shootings and on the legal argument that the HCSO improperly relied

on the district attorney's presentation of the matter to the grand jury for a decision

whether to sanction a deputy.[17]   Intentional inadequate forensic investigation and

improper delegation of disciplinary decision-making are not substitutes for, and do not

---

[15]      (...continued)
          of cases for 2002, 2003, and 2004 up to the Hiji Harrison incident," including non-fatal
          incidents.  *Id*. at 25.  Plaintiffs' other expert, Robert Keppel, examined the investigative
          reports for 38 officer-involved shootings from the same period.  Transcript of Testimony of
          Robert Keppel, January 29, 2007 ("Keppel Tr.") [Doc. # 503], at 13, 73-74.  Many were not
          fatalities, and in two of the incidents, there were no physical injuries.  *Id*. at 113; Plaintiffs'
          Exhibit ("PX") 410, *passim*.  Three of the investigations that he found to be substandard
          actually were performed by the Houston Police Department, not the HCSO, although Dr.
          Keppel opined that the HCSO bore ultimate responsibility for the weaknesses in those
          investigations.  *Id*. at 113.  For ease of reference, the Court assumes Plaintiffs' experts
          reviewed the same 38 pre-Harrison officer-involved shooting incidents.

[16]      *See* Keppel Tr., at 45; Klinger Tr., at 72.  Plaintiffs' experts' suspicions of the use of
          unjustified force are not admissible evidence.  *See General Elec. Co. v. Joiner*, 522 U.S. 136,
          145 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district
          court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of
          the expert."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993);
          *Michaels v. Avitech, Inc.*, 202 F.3d 746, 754 (5th Cir. 2000).

[17]      *See* Harris County Motion [Doc. # 485], at 6-7.  Plaintiffs' experts testified to various
          investigative omissions in many (but not all) of the IAD files, *see* Keppel Tr., at 16; Klinger
          Tr., at 74-84.  Keppel believed the under-investigation was intentional.  Keppel Tr., at 69.
          The experts did not explain if these omissions were material to the disposition of the incident
          for administrative, civil, or criminal purposes.

permit the jury to find, that any specific incident involved the use of unconstitutional excessive force.    Plaintiffs' evidence is insufficient to demonstrate a persistent, widespread custom of use of excessive force.  *See Pineda*, 291 F.3d at 325.[18]

A comparison to the evidence in *Pineda v. City of Houston* is instructive.  In *Pineda*, a sample of 500 searches involving narcotics was excerpted from more than 5,000 offense reports produced by City of Houston in discovery.  *Id.*  The district court held, on the basis of eleven of these searches, that there was a question of material fact as to whether the City had a custom of unconstitutional searches.  *Id.*  The Court of Appeals disagreed, concluding that the extrapolation was unsupported by the evidence, partially "because the sample of alleged unconstitutional events is just too small."  *Id.* ("Eleven incidents each ultimately offering equivocal evidence of compliance with the

---

[18]    If Plaintiffs seek to rely on an excessive force theory not limited to officer-involved shootings, the theory fails.  Plaintiffs did not present evidence of a sufficient number of such incidents to support a jury finding that there was a persistent and widespread pattern under the circumstances presented.  The HCSO is a large department — Chief Deputy Michael Smith testified that the HCSO is the third-largest sheriff's department in the United States. Transcript of Testimony of Michael Smith, January 29, 2007 ("Smith Tr.") [Doc. # 498], at 33.  In 2004, the year of Harrison's death, Harris County reported 2,547 commissioned personnel in the Sheriff's Office, including roughly 850 "patrol deputies." TEXAS CRIME REPORT FOR 2004 ("2004 Crime Report"), Texas Department of Public Safety, at 74 (available at www.txdps.state.tx.us/administration/crime_records/pages/crimestatistics.htm). The Court takes judicial notice of this fact, which is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EV. 201(b).  Chief Deputy Smith testified that at the time of trial, the HCSO employed 3,500 deputies.  Smith Tr., at 38.  The HCSO performed well over 6,900 arrests that year. 2004 Crime Report, at 148.  The Department of Public Safety reported 6,912 arrests for indexed crimes (murder, rape, robbery, aggravated assault, burglary and larceny).  The total number of arrests was not reported.  *Id.*

Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."). Here, if the Court deems the 38 officer-involved shooting incidents to be analogous to the sample of 500 searches in *Pineda*, then the eleven allegedly unconstitutional searches in *Pineda* should be compared to officer-involved shootings prior to Harrison that involved use of excessive force. Plaintiffs presented no evidence that *any* of those incidents met this criterion. Plaintiffs' evidence therefore is weaker than that which failed in *Pineda*. Thus, Plaintiffs submitted insufficient evidence to support a jury verdict that the HCSO had a *per se* policy or custom of deputies' use of excessive force or deadly force.[19]

***Under-Investigation of Officer-Involved Shootings by HCSO.***— Plaintiffs theorize that the HCSO adopted a policy or custom of intentionally forensically under-investigating officer-involved shootings (the "under-investigation theory").[20] Plaintiffs' first expert, Robert D. Keppel, who holds a multi-disciplinary Ph.D. in criminal justice,[21] opined that fourteen of the 38 officer-involved shooting investigation files

---

[19]   Plaintiffs also have not demonstrated under this theory that the HCSO policymaker actually knew or had constructive knowledge of any alleged sanctioned custom or practice of use of excessive force by deputies, in officer-involved shootings or otherwise.

[20]   This theory is distinct from but implicitly a predicate for Plaintiffs' arguments criticizing HCSO's delegation of the administrative discipline decisions in officer-involved shootings to the District Attorney and grand jury.

[21]   Dr. Keppel testified that his degree involved comprehensive study and examinations in
(continued...)

"flunked" in that they did not pass muster under the National Sheriff's Association, the International Association of Chiefs of Police ("IACP"), and textbooks' standards, and did not in his opinion meet HCSO's own standards.[22]  He deemed nine of the HCSO investigations questionable, because they each had one flaw but were otherwise "good."  He did not rate the rest of the investigations.[23]  He believed the investigations he reviewed were intentionally inadequate in that the HCSO homicide investigations knew how to do more thorough investigations.[24]

Plaintiffs' second expert, David A. Klinger, who holds a Ph.D. in sociology, opined that the investigative practices in a "substantial number" of the 36 cases he reviewed were below the aspirational standards of the IACP, that the HCSO homicide detectives gave undue credence to deputies' explanations of the events, and there was a failure to develop key points about the events.  Dr. Klinger opined that "[t]he custom and practice of the Harris County Sheriff's Department is to conduct incomplete and

---

[21]     (...continued)
         "sociology, psychology, psychiatry, anthropology, dentistry, pathology and law." Keppel Tr., at 9.

[22]     *Id*. at 74.  He did not give any opinion on how the investigations rated under the state-mandated standards of the Texas Commission on Law Enforcement Officer Standards and Education.  *Id*. at 71.

[23]     *Id*. at 73-74.

[24]     *Id*. at 44, 47.

inadequate investigations of shootings involving their deputies."[25]   Dr. Klinger

admitted, however, that not all the files had issues and did not know if he reviewed the

entire homicide and IAD file in each instance.[26]  Dr. Klinger also opined that people at

the "bottom of an organization" tend to break institutional rules if the rules are not

enforced.[27]  Dr. Klinger acknowledged that most shootings by law enforcement officers

are found to be justified, and he does not criticize the HCSO merely because the

shootings were found to be justified.[28]

     To prevail on their § 1983 claim against the County, as noted above, Plaintiffs

had to adduce evidence of the existence of a custom; that the policymaker actually or

constructively knew of the custom; that the custom was the moving force behind a

constitutional injury; and that the HCSO, in adopting the custom, was deliberately

indifferent to the risk that constitutional injuries would result from the policy.

     The Court assumes for purposes here that Plaintiffs presented sufficient evidence

to prove "a persistent, widespread practice" of the HCSO under-investigating of

officer-involved shootings prior to the Harrison incident.  Plaintiffs' theory that this

---

[25]     Klinger Tr., at 85.

[26]     *Id*. at 134.

[27]     *Id*. at 71.

[28]     *Id*. at 92.

practice caused Wilkinson's use of excessive force on Harrison nevertheless fails for lack of proof that the custom was the "moving force" of a constitutional injury.[29]  As noted earlier, to show moving force, Plaintiffs were required to show that the municipal practice affirmatively caused the alleged constitutional injury.  *See Brown*, 520 U.S. at 404; *Fraire*, 957 F.2d at 1281.  Mere but-for causation is insufficient.  *See Fraire*, 957 F.2d at 1281.  The "municipal policy must be *affirmatively* linked to the constitutional violation."  *Fraire*, 957 F.2d at 1281 (citing *Dodson*, 454 U.S. at 326 (emphasis added)).

Plaintiffs did not produce evidence that an omission in any investigation was material to the outcome of that investigation.  That is, Plaintiffs presented no evidence that any of the investigation outcomes likely would have changed had the additional steps recommended by Plaintiffs' experts been completed.  Nor was there a showing that for the officer-involved shootings the district attorneys could not or did not do additional investigation.[30]  There also was no evidence that the putatively poor quality of investigations was known to the deputies generally or those accused of engaging

---

[29]    The Court, as noted earlier, assumes there was sufficient evidence that Harrison's shooting was a constitutional injury resulting from Wilkinson's use of excessive force.

[30]    Indeed, Assistant District Attorney Edward Porter stated without contradiction that he or other assistants in fact did participate in the initial investigations on the nights of the shootings and sometimes obtained additional evidence thereafter.  Transcript of Testimony of Edward Porter, January 30, 2007 [Doc. # 494], at 10.

subsequent excessive force incidents in officer-involved shootings.  Finally, Plaintiffs did not introduce evidence that deputies' use of excessive force in officer-involved shootings prior to the Harrison shooting went undetected as a consequence of the HCSO's failure to perform more complete investigations.[31]  Thus, there is insufficient evidence to support a jury finding that there was a practice of under-investigation that resulted in a custom of deputies' use of excessive force in officer-involved shootings.

Plaintiffs appear to rely heavily on the conclusory, unsubstantiated opinion of their expert, Dr. Klinger, that line workers in an organization tend to break known rules if the rules are not consistently enforced.  This opinion has no support in the record as applied to law enforcement officers generally, let alone to alleged excessive deadly force in the serious circumstances presented in officer-involved shooting incidents.  Further, Dr. Klinger's opinion is unsupported in this record by any detailed explanation or any empirical, psychological, or scientific empirical research or by peer reviewed articles.  *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007); *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *General Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997).

Even if Dr. Klinger's conclusion were shown to be supported by "a reliable basis in the knowledge and experience of his discipline," *Daubert*, 509 U.S. at 593-94,

---

[31]     As noted, there is a serious factual dispute about the Harrison shooting.

Plaintiffs' evidence is insufficient to support a jury verdict that the HCSO consistently failed to enforce its excessive force policy through under-investigation of officer-involved shootings (or otherwise).   There is no proof that any custom of under-investigation affected line deputies' thinking regarding officer-involved shootings or "affirmatively caused the alleged constitutional injury."   Plaintiffs therefore failed to adduce sufficient evidence to establish that the custom was a "moving force" in Harrison's death.

Plaintiffs also needed to prove at trial that the HCSO was deliberately indifferent to the rights of the public to be free from deputies' excessive use of force.   *See Piotrowski*, 237 F.3d at 581 (municipal "policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens").   The difficulty, as *Piotrowski* recognized, "is how to prove the existence of such a policy."   *Id*. at 581-82.   Plaintiffs "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."   *Brown*, 520 U.S. at 411.   "Deliberate indifference in this context 'describes a state of mind more blameworthy than negligence.'" *Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 254-55 (5th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835  (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).   "[A]cting or failing to act with deliberate

indifference to a substantial risk of serious harm . . . is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836; *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004) ("[t]o act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety"); *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) (standard for deliberate indifference is whether "the officials' conduct reflected a conscious disregard for the risk that students would suffer bodily injuries of constitutional dimensions at the hands of student cadet leaders"); *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (stating that a plaintiff "must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the [plaintiff's] health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed").  Further, a predicate for proof of deliberate indifference is that the plaintiffs "must generally demonstrate at least a pattern of similar violations [of constitutional rights]." *Thompson*, 245 F.3d at 459; *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004); *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003); *Snyder*, 142 F.3d at 798 (citing *Rodriguez*, 871 F.2d at 554-55).

Plaintiffs did not adduce sufficient proof on this element.  Some officer-involved shootings are inevitable in any large, urban environment.  Proof that HCSO deputies

were involved in officer-involved shootings that occurred but were not submitted to sufficiently rigorous forensic inquiries does not meet the deliberate indifference burden. Plaintiffs did not present proof that the other shooting incidents were sufficiently similar to the Harrison incident so as to create a pattern. Plaintiffs also did not present evidence that HCSO investigators revealed the alleged under-investigation practice, if any, to line deputies or that HCSO policymakers knew that the line officers were aware of such investigation practices.

Plaintiffs' reliance on the conclusion by Dr. Keppel that the HCSO intentionally engaged in substandard investigations of officer-involved shootings also is unavailing. This conclusion, if even admissible, given its conclusory and speculative nature, is not evidence that the County was aware of and consciously disregarded the risk that such a policy would result in the constitutional harm of deputies using their guns to inflict injury through excessive force. Plaintiffs therefore failed to present adequate evidence that the County adopted an under-investigation policy "with 'deliberate indifference' as to its known or obvious consequences.'" *Johnson*, 379 F.3d at 309. The County is accordingly entitled to judgment as a matter of law on Plaintiffs' under-investigation theory.

### *Delegation of Administrative Sanctions Determinations to the Grand Jury.*—
Plaintiffs urge that the HCSO had an unconstitutional official policy for administrative

disciplinary review of officer-involved shootings because the HCSO relies on the Harris County District Attorney's presentation of each incident to a grand jury, and the HCSO imposes discipline only if the grand jury votes to indict the deputy for a crime (the "delegation theory").[32]  This practice is unconstitutional, Plaintiffs assert, because the district attorney and grand juries only investigate cases believed to involve criminal matters and there is no meaningful way to assess what is considered by the grand jury.[33] Plaintiffs posit further that the HCSO has failed to punish deputies for firing their weapons when the HCSO policymakers knew, or should have known, that the incidents involved excessive uses of force under a civil, but not criminal, burden of proof. Plaintiffs elaborate that the HCSO's reliance on the grand jury to vet the justification of an officer's use of force was, as a matter of law, legally improper because (i) the grand jury evaluates conduct against an unjustifiably stringent standard, *i.e.*, evaluation of whether he may have committed a crime; (ii) civil issues such as a deputy's alleged commission of a civil constitutional violation cannot be assessed by a grand jury, guided by the County's District Attorney, each of which is charged with evaluation of

---

[32]     The HCSO will impose administrative discipline for violations of objective rules.  *See* note 12, *supra*.

[33]     *See* Plaintiffs' Pre-Trial Brief Regarding Criminal Law Standard for Reviewing Officer-Involved Shootings [Doc. # 421], at 2 ("[S]uch a criminal law burden of proof deprives citizens of constitutional rights by requiring proof "beyond a reasonable doubt" before offending officers would be punished for using excessive force.  Constitutional rights, however, are to be protected under a preponderance of the evidence standard.").

criminal matters only; (iii) as a practical matter, the grand jury's analysis is governed by the "beyond a reasonable doubt" standard, rather than the civil law "preponderance of the evidence" standard applicable to allegations of civil rights violations; and (iv) the secrecy of the criminal grand jury unfairly deprives Plaintiffs and the Court of the ability to conduct meaningful civil review of the HCSO's conduct with respect to Wilkinson and other deputies.[34]  Plaintiffs thus deduce in their delegation theory that there is a lack of adequate HCSO administrative review of officer-involved shootings, which in turn results in deputies' unconstitutional use of excessive force against citizens.  The Court assumes that HCSO's reliance on the grand jury is a formal official policy under § 1983.

The Court turns to the "moving force" element of proof in a § 1983 claim. Plaintiffs did not adduce evidence sufficient to support a jury verdict on this issue.  As noted earlier, to show moving force, Plaintiffs were required to show that the municipal practice *affirmatively caused* the alleged constitutional injury.  *See Brown*, 520 U.S. at 404 (there must be a "direct causal link between the municipal action and the deprivation of federal rights"); *Fraire*, 957 F.2d at 1281 (the "municipal policy must be *affirmatively* linked to the constitutional violation" (citing *Dodson*, 454 U.S. at 326)).  Mere "but-for" causation is insufficient.  *See Fraire*, 957 F.2d at 1281

---

[34]     *See* Plaintiffs' Response [Doc. # 520], at 2.

(emphasis added).  Plaintiffs needed to present at trial circumstantial or direct evidence sufficient to support a jury verdict that Wilkinson knew that the County would delegate to the grand jury decision-making authority regarding officer-involved shootings, and also that this knowledge was the affirmative cause for Wilkinson to use deadly excessive force on Harrison.  Construing the evidence in the light most favorable to Plaintiffs, they did not meet this burden.

Plaintiffs rely primarily on Wilkinson's testimony for the "moving force" element on this theory.  Wilkinson testified that he was aware of some of the HCSO officer-involved shootings[35] and was acquainted with at least three officers whom he later learned had been involved in shootings.[36]  Wilkinson testified that he knew that the HCSO did an investigation of the facts and then referred the matter to a grand jury, which would decide whether the shooting was justified.[37]  He was not aware of any

---

[35]    *See* Transcript of Testimony of William Wilkinson, January 30, 2007 ("Jan. 30 Wilkinson Tr.") [Doc. # 497], at 41 ("The shootings where a deputy was injured or lost his life, we heard about it, so I could assume that I knew of the shooting.").

[36]    Wilkinson initially testified that he knew a number of deputies that had been involved in shootings, but was not certain that he had known them before he shot Harrison.  *See id.* at 41-42.  He was certain, however, that he had known of the shootings themselves, and at least three of the deputies.  *Id.* at 41, 52.

[37]    Jan. 30 Wilkinson Tr., at 34 ("Q.  [You knew]  that [the Harrison shooting] would be considered by a criminal grand jury?  A.  Yes, sir.  Q.  Okay.  And that that criminal grand jury would make the final decision about whether the shooting was justified or not[?]  A.  I wasn't sure how it worked, sir.").  Wilkinson later explained that he did understand the grand jury's role.  *See id.* at 45 ("Q.  [P]rior to the shooting of Hiji Harrison, if a shooting was
(continued...)

instances in which officers were indicted, except for an incident in which one deputy shot another deputy.[38]  Wilkinson denied having specific knowledge of the details of other incidents or the outcomes of the investigations.[39]  Under applicable law, the evidence presented by Plaintiffs is not sufficient to prove that the HCSO's delegation of the disciplinary decision to the grand jury was a moving force, *i.e.*, an affirmative cause, of Wilkinson's shooting of Harrison.  There is no evidence of what Wilkinson's understanding was of the burdens of proof that apply in the grand jury setting.[40]  There is no evidence that Wilkinson believed the "beyond a reasonable doubt" standard would apply in the grand jury setting and that this belief would make it more likely that

---

[37]     (...continued)
determined to be justified, did you understand that to be by the grand jury or someone else?  A.  Grand jury, I assume, sir. . . .  Q.  But in terms of making a determination of whether your shooting, your use of force was justified or not, you were relying upon the grand jury to do that?  A.  One part of it, sir.").

[38]     *See* PX 410.

[39]     Jan. 30 Wilkinson Tr., at 25 ("we understand and hear when someone was shot, but we don't get the details or who was involved, usually").

[40]     As a matter of law, the grand jury issues an indictment when it determines that there is "probable cause" to prosecute the accused.  *Rodriguez v. State*, 104 S.W.3d 87, 93 (Tex. Crim. App. 2003) ("The grand jury will not indict unless sufficient probable cause exists and there is enough evidence to formally charge a person with an offense.")  "Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed or is committing an offense."  *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997).  The "beyond a reasonable doubt" standard is a prosecutor's burden at trial, not at the indictment stage.

Wilkinson would shoot and kill Harrison than if he believed that the HCSO supervisors made the administrative decision about deputy punishment.

Plaintiffs in their Memorandum argue Wilkinson was "motivated" to act improperly toward Harrison.[41]  Plaintiffs' argument so phrased falls by its own weight. The standard to prove a "motivating factor" is less stringent than a showing of a "but-for" cause.  *See Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005) (plaintiff in a Title VII action was "held to a lower standard in proving the causation element" where the district court instructed the jury on a "motivating factor" rather than "but for" causation standard); *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  Proof of a "motivating factor" or a "but-for-cause" does not meet Plaintiffs' § 1983 burden to show that the HCSO's policy was the moving force for Wilkinson's conduct requires *Brown*, 520 U.S. at 404; *see Fraire*, 957 F.2d at 1281.

Plaintiffs also attempt to show "moving force" causation through evidence that Wilkinson "had the training manual indicating the review process by the district

---

[41]     Plaintiffs argue that there is "sufficient evidence for a reasonable jury to conclude Wilkinson's conduct on the night in question was motivated by a belief that he could violate Harrison's civil rights."  Plaintiffs' Mem., at 4.  Plaintiffs further assert: "Wilkinson testified that he was aware that investigations of other sheriff [*sic*] deputies involved in multiple shootings were being undertaken. . . .  Thus, there is sufficient evidence for a reasonable jury to conclude Wilkinson's conduct on the night in question was motivated by a belief that he could kill Harrison, manufacture evidence (throw down gun) to create reasonable doubt, and escape accountability."  *Id.*, at 4-5.

attorney and grand jury."[42]  This theory is futile.  Plaintiffs point to a single lesson plan

from the HCSO's training academy.[43]  This document was not introduced in evidence

at trial or submitted to the jury.  It is thus cannot be part of the Court's Rule 50(b)

consideration.  Even if the lesson plan had been received in evidence, it establishes at

most that Wilkinson learned that the district attorney's duty was to "[m]ake sure

shooting in compliance with law/civil rights law [*sic*],"[44] and that the grand jury

"[i]nvestigates all shootings."[45]  This standard is vague at best and there is no evidence

of how Wilkinson or any other deputy interpreted it.[46]  No reasonable jury could find,

on the basis of the evidence at trial or the lesson itself, that the materials used to train

Wilkinson constituted a direct, causal link between any County policy and Harrison's

injury.[47]

---

[42]     Plaintiffs' Mem., at 4.

[43]     *See* Harris County Sheriff's Academy Instructor's Lesson Plan ("Lesson Plan") [Doc. # 512], Appendix to Plaintiffs' Response.

[44]     Lesson Plan, at 27.

[45]     *Id*. at 29.

[46]     Neither this document, nor any evidence admitted at trial, suggests that Wilkinson had any understanding about the burdens of proof borne by prosecutors during the grand jury and trial phases of a criminal case, how these standards differ from the burden of proof in a civil case, or how the various standards might affect the results of an officer-involved shooting investigations.

[47]     Plaintiffs' theory ignores the practical reality that deputies who injure members of the public are subject to civil litigation for money damages, even when there is no administrative or
(continued...)

Plaintiffs' delegation theory also is not legally viable because the evidence fails as a matter of law to satisfy the final element of a § 1983 claim, that the HCSO was "deliberately indifferent" to the public's constitutional rights to be free from deputies' use of excessive force caused by HCSO's delegation to the grand jury of the administrative punishment decision in officer-involved shootings. As noted, Plaintiffs "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. There is no proof that any HCSO policymaker through the delegation decision consciously disregarded a known and excessive risk to the constitutional rights of the public. *See Hernandez*, 380 F.3d at 880.

In summary, although the HCSO plainly delegated to grand juries (through County prosecutors) the duty to determine for administrative purposes if deputies used excessive force in officer-involved shootings, Plaintiffs have failed to present adequate evidence that this delegation policy was the moving force behind Wilkinson's alleged use of excessive force against Harrison or that the HCSO was deliberately indifferent to the members of the public's constitutional rights by using this policy. The County is entitled to judgment on this theory as a matter of law.

---

[47]      (...continued)
          criminal punishment.

***Failure to Supervise.***— Plaintiffs argue that the HCSO failed to supervise Wilkinson, and that this omission was the cause of Harrison's death, the constitutional injury claimed in this case.[48]  "Supervisory officials cannot be held liable under section 1983 for the actions of subordinates . . . , on any theory of vicarious or respondeat superior liability." *Estate of Davis*, 406 F.3d at 381 (citing *City of Canton*, 489 U.S. at 385; *Monell*, 436 U.S. at 691; *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003); *Alton*, 168 F.3d at 201; *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987)).  "Rather, Plaintiffs must show that the conduct of the supervisors denied [Harrison] his constitutional rights." *Id.* (citations omitted).  To prove a failure to supervise claim under § 1983, "the plaintiff must show that: (1) the supervisor . . . failed to supervise . . . the subordinate official; (2) a causal link exists between the failure to . . . supervise and the violation of the plaintiff's rights; and (3) the failure to . . . supervise amounts to deliberate indifference." *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998), and citing, *e.g., Burge*, 336 F.3d at 370; *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003); *Thompson*, 245 F.3d at 459); *see Kohler v. Englade*, 470 F.3d 1104, 1114-15 (5th Cir. 2006).

---

[48]     Plaintiffs also appear to assert an argument that the HCSO failed to adequately train Wilkinson. *See* Plaintiffs' Response, at 2-3.  Before trial, however, Plaintiffs acknowledged in open court that there was no failure to train element to their claims against the County. *See* Transcript of Hearings held on September 11, 2006 [Doc. # 307], at 114.  Plaintiffs thus abandoned this claim.

To prevail on a failure to supervise claim, the Plaintiffs must identify the supervisors who allegedly failed to perform the necessary duties and demonstrate that the identified individual(s) "had subjective knowledge of a serious risk of harm to the victims [or a category of people]." *Atteberry*, 430 F.3d at 255.  "The test for deliberate indifference is subjective, rather than objective, in nature because 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'"  *Id.* (quoting *Farmer*, 511 U.S. at 838; *see also Hernandez*, 380 F.3d at 880; *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999).  Following the Supreme Court's clear direction, the Court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."  *Hernandez*, 380 F.3d at 881 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)) (emphasis in *Hernandez*).

"Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Thompson*, 245 F.3d at 459 (citing *Snyder*, 142 F.3d at 798-99; *Belt*, 828 F.2d at 304-05).  "The plaintiff must generally demonstrate at least a pattern of similar violations."  *Id.* (citing *Snyder*, 142 F.3d at 798).  "Furthermore, the inadequacy of [supervision] must be obvious and obviously likely to result in a constitutional violation." *Id.* (citing *City of Canton*, 489

U.S. at 390 n.10; *Snyder*, 142 F.3d at 799).   Standing alone, an expert's opinion generally will not be enough to establish deliberate indifference.  *Id.*

Plaintiffs in their post-trial submissions rely on seven incidents in which Wilkinson allegedly used excessive force without being sanctioned or reprimanded, and thus that the HCSO's supervision of him was inadequate.  Plaintiffs' evidence consists largely of one page listing of five incidents, two investigations by the HCSO IAD involving earlier incidents, and the Harrison IAD file.[49]   Plaintiffs' arguments are unavailing under the applicable legal authority on failure to supervise claims.  Two of the events have no probative value because they are not incidents prior to the Harrison shooting.  One is the Harrison incident itself, and the other is an incident subsequent to Harrison's death.  The latter did not involve force, and was the cause of the HCSO's termination of Wilkinson's employment.[50]   Plaintiffs also rely on an incident involving Ronald Lynch, a victim of an alleged assault by Wilkinson.  Lynch never filed a written complaint or formally brought it to the HCSO's attention, however, and this incident was not before the jury.  The Court cannot consider these three incidents for purposes of Rule 50(b).

---

[49]   *See* Defendant's Exhibit ("DX") 110, at IAD 14133 (one page list); DX 110 (Barkley incident); DX 111 (Juarez incident); PX 289, 292 [other cites to Harrison investigation files].

[50]   *See* Transcript of Testimony of William Wilkinson, January 29, 2007 ("Jan. 29 Wilkinson Tr."), at 9-10.

Another incident, which took place on May 7, 2004, eight days before the Harrison encounter, involved Robert Barkley, whom Wilkinson was trying to arrest for shoplifting in Humble, Texas. Wilkinson, while working an approved "extra job," shot Barkley outside a Dillard's store while Barkley was in his car in the parking lot. Wilkinson claimed Barkley was trying to escape and to run him over. The HCSO allowed Wilkinson to return to work within days of the event. The case was presented to a Harris County grand jury, which issued a "no bill" in late September 2005. This incident has limited probative value because the HCSO investigation was still underway when the Harrison incident occurred.[51]

Plaintiffs also adduced evidence from Bonifacio Juarez, a detainee who alleged that on October 6, 2003, Wilkinson beat him while he was handcuffed in a HCSO station house.[52] Juarez filed a complaint against Wilkinson. Wilkinson complained that Juarez severely kicked and otherwise attacked him. The Harris County District Attorney prosecuted Juarez for assaulting Wilkinson, and Juarez pleaded guilty. The facts of this incident were hotly contested at the time and at trial.

---

[51]    *See* DX 110, at IAD 14134.  On or about June 4, 2004, the HCSO did its own IAD investigation and later referred the matter to the Harris County District Attorney.

[52]    *See* DX 111.

There are no details whatsoever in the record on the two remaining incidents on which Plaintiffs rely. Plaintiffs refer to one as an "[a]ssault against residents of a home during a warrantless search (exonerated)" and the other as "[p]hysical assault of a black motorist and use of racial epithet (exonerated)."[53] Plaintiffs cite to no admissible evidence in the record on these events and they therefore are not probative of the issues at bar. Thus, the Court considers whether Plaintiffs have established a fact issue on the failure to supervise claim based on the Barkley, Juarez, and Harrison incidents. The outcome of this question turns on whether, when construed in the light most favorable to Plaintiffs, the Barkley and Juarez incidents can be construed as being sufficiently similar to the Harrison shooting to potentially form a pattern that supports a finding that the HCSO's conduct caused Wilkinson to shoot Harrison and a finding that the HCSO was deliberately indifferent to the rights of the public under the Fifth Circuit's rigorous standard. *See Smith*, 158 F.3d at 911-12; citations *supra* at 31-32.

The Court, based on a careful review of the record and construing the evidence in the light most favorable to Plaintiffs, concludes that the trial evidence does not support a reasonable jury's finding that the HCSO's failure to supervise Wilkinson caused him to shoot Harrison. As to causation, Plaintiffs contend that the HCSO should not have allowed Wilkinson to resume his duties after the Barkley shooting on

---

[53]     DX 110, at IAD 14134.

May 7, 2004, which followed the Juarez incident in October 2003. Plaintiffs do not establish that the unnamed supervisors were a cause-in-fact of Harrison's injury. *See Estate of Davis*, 406 F.3d at 381 (requiring "a causal link . . . between the failure to train or supervise and the violation of the plaintiff's rights"); *Evett*, 330 F.3d at 689 (requiring "a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation" (citing *Thompkins*, 828 F.2d at 304)); *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor"). Even assuming that the HCSO improperly allowed Wilkinson to resume his patrol duties after he was accused of wrongdoing while in the station house and while working an approved outside job, there is no affirmative link between that decision and Wilkinson's use of excessive force, which, as alleged, violated HCSO's official policies and standards.[54]

Turning to deliberate indifference, Plaintiffs have not demonstrated which supervisor was remiss or "had subjective knowledge of a serious risk of harm to the victims [or a category of people]." *Atteberry*, 430 F.3d at 255. Plaintiffs have not shown any member of the HCSO "both [was] aware of facts from which the inference

---

[54]    Plaintiffs claim amounts to a theory that "but for" the HCSO allowing Wilkinson to resume his duties shortly before May 16, 2004, he would not have been in a position to arrest and shoot Harrison. But for causation is insufficient.

could be drawn that a substantial risk of serious harm exists, and . . . also [drew] the inference." *See Smith*, 158 F.3d at 911-12 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Wilson v. Seiter*, 501 U.S. 294 (1991)).  Nor have Plaintiffs shown that any particular person was reckless in disregarding the potential harm to the public of allowing Wilkinson to resume his duties in May, 2004.  There is no evidence that anyone in the HCSO drew the conclusion from the Juarez or Barkley incidents that there was a serious risk that Wilkinson was a danger to others or that any supervisor ignored such conclusion.  Plaintiffs did not produce sufficient evidence that any particular supervisor's failure to supervise Wilkinson was the cause of  Harrison's death or that any particular supervisor was deliberately indifferent to the rights of the public.[55]

### B.    Ratification

Defendant County contends that Plaintiffs failed to adduce evidence sufficient to support a reasonable jury's verdict that the County, through the HCSO, ratified

---

[55]    Plaintiffs also implicitly argue that the HCSO violated § 1983 for failing to discipline Wilkinson for his past misconduct.  This theory was explicitly presented to the jury only as a component of the ratification theory, which is discussed in the next section of this Memorandum. *See* Jury Charge [Doc. # 474], at 10.  If this theory could be an independent custom or practice, *Praprotnik*, 237 F.3d at 581 ("Self-evidently, a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens."), it suffers the same defects as Plaintiffs' "failure to supervise" and other claims, and is futile.

Wilkinson's alleged use of deadly excessive force.[56]  Ratification occurs "when a subordinate's decision is subject to review by the municipality's authorized policymakers," and "the authorized policymakers approve a subordinate's decision and the basis for it." *Praprotnik*, 485 U.S. at 127.  Ratified misconduct is "chargeable to the municipality because [the authorized policymakers'] decision is final." *Id.* Harrison's death, even if not otherwise attributable to an official policy or practice, would therefore support the County's liability if the County (through the HCSO) knowingly approved of Wilkinson's misconduct in shooting Harrison.

Plaintiffs argue that "Chief Deputy Billingsley affirmatively testified that the Sheriff approves of Wilkinson's use of force on the night in question," and that "Harris County admits that Wilkinson's conduct on the night in question conformed with approved practices and policies of the sheriff [*sic*] department."[57]  These admissions are not sufficient to establish Plaintiffs' ratification theory.  Ratification creates liability where "a municipality's final policymakers are held effectively to have made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees." *Turner v. Upton County*, 915 F.2d 133, 137 (5th

---

[56]     *See* County Motion, at 21-22.

[57]     Plaintiffs' Mem., at 9 n.8.  *See* Transcript of Testimony of Danny Billingsley, January 26, 2007 ("Billingsley Tr."), at 10 (agreeing that "Sheriff Tommy Thomas approves of the manner in which William Wilkinson shot and killed Hiji Harrison").

Cir. 1990).  Plaintiffs were therefore required to present evidence not merely that a policymaker knew and approved of the shooting, but that the policymaker knew that the shooting violated Harrison's civil rights because the shooting was clearly excessive to Wilkinson's apparent need to defend himself.  Wilkinson, the only surviving witness to the events of testified to his version of the events in question, gave an account of the shooting that, if believed, justified his actions.  If the relevant policymaker believed Wilkinson's version of events, then the County did not ratify "unconstitutional or illegal actions."  *Id*.  The Fifth Circuit has explicitly held that a municipality is not liable under the ratification theory where a sheriff accepts his deputies' version of events, so long as "that version did not show that the deputies' actions were manifestly indefensible." *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986); *see also Fraire*, 957 F.2d at 1268 ("Plaintiffs present nothing but conjecture when they allege that [the municipality] must have known [the officer] was lying.").

The County's evidence, the testimony of the HCSO officers, contradicted Plaintiffs' theory, and the jury could not reach a verdict.  Plaintiffs do not (and cannot) argue that they introduced evidence sufficient to support a reasonable jury verdict that the County's policymaker disbelieved Wilkinson's account but ratified his conduct

regardless.[58]  Plaintiffs have no proof that the County in 2004 believed Plaintiffs version of events from the night in question was false, and Plaintiffs' bare assertion is not sufficient to carry their burden on a motion for judgment as a matter of law.[59]

## C.  Plaintiffs' Motions

Finally, the Court addresses the viability of Plaintiffs' Motion and the James Motion.  Having concluded above that Plaintiffs have failed to produce at trial evidence to support all the elements on any of their claims, and therefore concluding that those claims must be dismissed, it is not necessary to reach Plaintiffs' Motion and the James Motion.[60]

---

[58]  Plaintiffs' response to the County's Motion merely recites, without explanation or citation to any evidence, that "Harris County, with full knowledge of Wilkinson's conduct on the night in question, has ratified and accepted same as conduct that complied with approved policies and practices of the County."  Plaintiffs' Response, at 2.  It is noted that Plaintiffs argued and presented evidence at trial that all or part of Wilkinson's account was false.

[59]  Indeed, it took Plaintiffs years to develop evidence in support of their factual theory of the night in question.

[60]  In any event, the Motions would be denied.  Plaintiffs cite no authority for the proposition that a purely legal dispute is the proper subject of a motion for judgment as a matter of law after trial, when no Rule 50(a) motion was made.  The Court rejects Plaintiffs' arguments to the contrary.  Even if the Court found that HCSO's delegation policy was legally insufficient to protect the civil rights of citizens subjected to deputies' non-criminal use of excessive force, as Plaintiffs urge, Plaintiffs would still be required to show the other elements of § 1983 liability, such as moving force and deliberate indifference.  Having failed to move under Rule 50(a) before the jury commenced deliberating, Plaintiffs may not now bring a motion under either Rule 50(a) or 50(b).  Plaintiffs' Motion would accordingly be denied on this procedural basis, if any of Plaintiffs' claims survived.

## V.    CONCLUSION

The County has demonstrated that Plaintiffs failed to adduce evidence at trial sufficient to support a jury verdict in their favor on any of Plaintiffs' claims against the County.  A reasonable jury could not have found, on the basis of the evidence at trial, that the County adopted an official policy, practice, or custom that was the moving force of Harrison's death, even if it found that Wilkinson was unjustified in his use of deadly force.  A reasonable jury also could not find on the basis of the trial evidence that any of the alleged, articulated policies had a sufficient causal connection to Harrison's death to meet the "moving force" requirement for § 1983 liability.

Further, Plaintiffs failed to introduce evidence adequate to support a reasonable jury's conclusion that the County, through the HCSO, was aware of constitutional harms likely to result from any of the challenged and provable policies.[61]  Without such awareness, Plaintiffs cannot show deliberate indifference on the part of the County, precluding municipal liability under § 1983.

Nor could a reasonable jury have found that the County knew that Wilkinson's account of the events in question was false, but chose to ratify his conduct.

---

[61]    The County would presumptively be aware of constitutional harms arising from a *per se* policy of utilizing excess force.  The Court has held, however, that Plaintiffs have not introduced sufficient evidence to allow a reasonable jury to conclude that such a policy existed.  *See* pp. 12-15, *supra*.

Accordingly, the County is entitled to judgment as a matter of law on all Plaintiffs' claims asserted at trial.  It is therefore

**ORDERED** that Defendant Harris County's Motion for Judgment as a Matter of Law [Doc. # 485] is **GRANTED**.  It is further

**ORDERED** that Plaintiffs' Joint Motion for Judgment as a Matter of Law [Doc. # 508] is **DENIED**.  It is further

**ORDERED** that Plaintiff Julian James's Motion for Judgment as a Matter of Law [Doc. # 524] is **DENIED**.

The Court will issue a separate Final Judgment.

**SIGNED** at Houston, Texas, this **20th** day of **August, 2007.**

Nancy F. Atlas
United States District Judge